SMILEY *v.* CITIBANK (SOUTH DAKOTA), N. A.

No. 95–860.   Argued April 24, 1996—Decided June 3, 1996

SCALIA, J., delivered the opinion for a unanimous Court.

*Michael D. Donovan* argued the cause for petitioner. With him on the briefs were *Pamela P. Bond, Patrick J. Grannan, Robin B. Howald,* and *Michael P. Malakoff.*

*Richard B. Kendall* argued the cause for respondent. With him on the brief were *Michael H. Strub, Jr., Louis R. Cohen, Ronald J. Greene,* and *Christopher R. Lipsett.*

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Barbara C. Biddle, Jacob M. Lewis, Julie L. Williams, L. Robert Griffin,* and *Joan M. Bernott.**

*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Massachusetts et al. by *Scott Harshbarger,* Attorney General of Massachusetts, *Ernest L. Sarason, Jr.,* Assistant Attorney General, *Charles F. C. Ruff,* Corporation Counsel of the District of Columbia, and by the Attorneys General for their respective States as follows: *Winston Bryant* of Arkansas, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Thomas J. Miller* of Iowa, *A. B. Chandler* of Kentucky, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jeffrey R. Howard* of New Hampshire, *Deborah T. Poritz* of New Jersey, *Tom Udall* of New Mexico, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Jeffrey B. Pine* of Rhode Island, *Charles W. Burson* of Tennessee, *Dan Morales* of Texas, *Jeffrey L. Amestoy* of Vermont, *Christine Gregoire* of Washington, and *Darrell V. McGraw, Jr.,* of West Virginia; for the Bankcard Holders of America by *Kennedy P. Richardson;* for Consumer Action by *James C.*

JUSTICE SCALIA delivered the opinion of the Court.

Section 30 of the National Bank Act of 1864, Rev. Stat. § 5197, as amended, 12 U. S. C. § 85, provides that a national bank may charge its loan customers "interest at the rate allowed by the laws of the State . . . where the bank is located." In *Marquette Nat. Bank of Minneapolis* v. *First of Omaha Service Corp.*, 439 U. S. 299 (1978), we held that this provision authorizes a national bank to charge out-of-state credit-card customers an interest rate allowed by the bank's home State, even when that rate is higher than what is permitted by the States in which the cardholders reside. The question in this case is whether § 85 also authorizes a national bank to charge late-payment fees that are lawful in the bank's home State but prohibited in the States where the cardholders reside—in other words, whether the statutory term "interest" encompasses late-payment fees.

## I

Petitioner, a resident of California, held two credit cards— a "Classic Card" and a "Preferred Card"—issued by respond-

*Sturdevant;* and for the National Consumer Law Center et al. by *Mark A. Chavez* and *Patricia Sturdevant.*

Briefs of *amici curiae* urging affirmance were filed for the State of Colorado et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, *Carter G. Phillips,* and *James M. Harris,* and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Michael J. Bowers* of Georgia, *Jim Ryan* of Illinois, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Thomas W. Corbett, Jr.,* of Pennsylvania, *Mark Barnett* of South Dakota, *Jan Graham* of Utah, and *James S. Gilmore III* of Virginia; for Affinity Group Marketing et al. by *Theodore W. Kheel;* for the American Bankers Association et al. by *Shirley M. Hufstedler, L. Richard Fischer, James A. Huizinga,* and *W. Stephen Smith;* for Greenwood Trust Co. et al. by *Arthur R. Miller, Alan S. Kaplinsky,* and *Burt M. Rublin;* for the New York Clearing House Association by *John L. Warden* and *Richard J. Urowsky;* and for Trial Lawyers for Public Justice et al. by *Ann Miller* and *Adele P. Kimmel.*

ent, a national bank located in Sioux Falls, South Dakota. The Classic Card agreement provided that respondent would charge petitioner a late fee of $15 for each monthly period in which she failed to make her minimum monthly payment within 25 days of the due date. Under the Preferred Card agreement, respondent would impose a late fee of $6 if the minimum monthly payment was not received within 15 days of its due date; and an additional charge of $15 or 0.65% of the outstanding balance on the Preferred Card, whichever was greater, if the minimum payment was not received by the *next* minimum monthly payment due date. Petitioner was charged late fees on both cards.

These late fees are permitted by South Dakota law, see S. D. Codified Laws §§ 54-3-1, 54-3-1.1 (1990 and Supp. 1995). Petitioner, however, is of the view that exacting such "unconscionable" late charges from California residents violates California law, and in 1992 brought a class action against respondent on behalf of herself and other California holders of respondent's credit cards, asserting various statutory and common-law claims.[1] Respondent moved for judgment on the pleadings, contending that petitioner's claims were pre-empted by § 85. The Superior Court of Los Angeles County initially denied respondent's motion, but the California Court of Appeal, Second Appellate District, issued a writ of mandate directing the Superior Court to either grant the motion or show cause why it should not be required to do so. The Superior Court chose the former course, and the Court of Appeal affirmed its dismissal of the complaint, 26 Cal. App. 4th 1767, 32 Cal. Rptr. 2d 562 (1994). The Supreme Court of California granted review and affirmed, two

---

[1] By way of common-law claims, petitioner's complaint alleged breach of duty of good faith and fair dealing; unjust enrichment; fraud and deceit; negligent misrepresentation; and breach of contract. It also alleged violation of Cal. Bus. & Prof. Code Ann. § 17200 (West Supp. 1996) (prohibiting unlawful business practices) and Cal. Civ. Code Ann. § 1671 (West 1985) (invalidating unreasonable liquidated damages).

justices dissenting. 11 Cal. 4th 138, 900 P. 2d 690 (1995). We granted certiorari. 516 U. S. 1087 (1996).

## II

In light of the two dissents from the opinion of the Supreme Court of California, see 11 Cal. 4th, at 165, 177, 900 P. 2d, at 708, 716 (Arabian, J., dissenting, and George, J., dissenting), and in light of the opinion of the Supreme Court of New Jersey creating the conflict that has prompted us to take this case,[2] it would be difficult indeed to contend that the word "interest" in the National Bank Act is unambiguous with regard to the point at issue here. It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–845 (1984). As we observed only last Term, that practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws. "The Comptroller of the Currency," we said, "is charged with the enforcement of banking laws to an extent that warrants the invocation of [the rule of deference] with respect to his deliberative conclusions as to the meaning of these laws." *NationsBank of N. C., N. A.* v. *Variable Annuity Life Ins. Co.*, 513 U. S. 251, 256–257 (1995) (citations and internal quotation marks omitted).

On March 3, 1995, which was after the California Superior Court's dismissal of petitioner's complaint, the Comptroller of the Currency noticed for public comment a proposed regu-

---

[2] *Sherman* v. *Citibank (South Dakota), N. A.*, 143 N. J. 35, 668 A. 2d 1036 (1995). The Supreme Court of Colorado and the United States Court of Appeals for the First Circuit have adopted the same interpretation as the Supreme Court of California. See *Copeland* v. *MBNA America Bank, N. A.*, 907 P. 2d 87 (Colo. 1995); *Greenwood Trust Co.* v. *Massachusetts*, 971 F. 2d 818, 829–831 (CA1 1992) (dictum), cert. denied, 506 U. S. 1052 (1993).

lation dealing with the subject before us, see 60 Fed. Reg. 11924, 11940, and on February 9, 1996, which was after the California Supreme Court's decision, he adopted the following provision:

> "The term 'interest' as used in 12 U. S. C. § 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports." 61 Fed. Reg. 4869 (to be codified in 12 CFR § 7.4001(a)).

Petitioner proposes several reasons why the ordinary rule of deference should not apply to this regulation. First, petitioner points to the fact that this regulation was issued more than 100 years after the enactment of § 85, and seemingly as a result of this and similar litigation in which the Comptroller has participated as *amicus curiae* on the side of the banks. The 100-year delay makes no difference. To be sure, agency interpretations that are of long standing come before us with a certain credential of reasonableness, since it is rare that error would long persist. But neither antiquity nor contemporaneity with the statute is a condition of validity. We accord deference to agencies under *Chevron*, not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute meant

for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. See *Chevron, supra,* at 843–844. Nor does it matter that the regulation was prompted by litigation, including this very suit. Of course we deny deference "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice," *Bowen* v. *Georgetown Univ. Hospital,* 488 U. S. 204, 212 (1988). The deliberateness of such positions, if not indeed their authoritativeness, is suspect. But we have before us here a full-dress regulation, issued by the Comptroller himself and adopted pursuant to the notice-and-comment procedures of the Administrative Procedure Act designed to assure due deliberation, see 5 U. S. C. § 553; *Thompson* v. *Clark,* 741 F. 2d 401, 409 (CADC 1984). That it was litigation which disclosed the need for the regulation is irrelevant.

Second, petitioner contends that the Comptroller's regulation is not deserving of our deference because "there is no rational basis for distinguishing the various charges [it] has denominated interest . . . from those charges it has denominated 'non-interest.'" Reply Brief for Petitioner 14. We disagree. As an analytical matter, it seems to us perfectly possible to draw a line, as the regulation does, between (1) "payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended," and (2) all other payments. To be sure, in the broadest sense *all* payments connected in any way with the loan—including reimbursement of the lender's costs in processing the application, insuring the loan, and appraising the collateral—can be regarded as "compensating [the] creditor for [the] extension of credit." But it seems to us quite possible and rational to distinguish, as the regulation does, between those charges that are *specifically as-*

*signed* to such expenses and those that are assessed for simply making the loan, or for the borrower's default. In its logic, at least, the line is not "arbitrary [or] capricious," and thereby disentitled to deference under *Chevron,* see 467 U. S., at 844. Whether it is "arbitrary [or] capricious" as an interpretation of what the *statute* means—or perhaps even (what *Chevron* also excludes from deference) "manifestly contrary to the statute"—we will discuss in the next Part of this opinion.

Finally, petitioner argues that the regulation is not entitled to deference because it is inconsistent with positions taken by the Comptroller in the past. Of course the mere fact that an agency interpretation contradicts a prior agency position is not fatal. Sudden and unexplained change, see, *e. g., Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.,* 463 U. S. 29, 46–57 (1983), or change that does not take account of legitimate reliance on prior interpretation, see, *e. g., United States* v. *Pennsylvania Industrial Chemical Corp.,* 411 U. S. 655, 670–675 (1973); *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 295 (1974), may be "arbitrary, capricious [or] an abuse of discretion," 5 U. S. C. § 706(2)(A). But if these pitfalls are avoided, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.

In any case, we do not think that anything which can accurately be described as a change of official agency position has occurred here. The agency's Notice of Proposed Rulemaking asserted that the new regulation "reflect[s] current law and [Office of the Comptroller of the Currency (OCC)] interpretive letters," 60 Fed. Reg. 11929 (1995), and the Statement of Basis and Purpose accompanying the final adoption stated that "[t]he final ruling is consistent with OCC interpretive letters in this area . . . and reflects the position the OCC has taken in *amicus curiae* briefs in litigation pending in many state and Federal courts," 61 Fed. Reg.

4859 (1996) (citing OCC interpretive letters). Petitioner points only to (1) a June 1964 letter from the Comptroller to the President's Committee on Consumer Interests, which states that "[c]harges for late payments, credit life insurance, recording fees, documentary stamp are illustrations of charges which are made by some banks which would not properly be characterized as interest," see App. to Brief for Petitioner 5a; and (2) a 1988 opinion letter from the Deputy Chief Counsel of the OCC stating "it is my position that [under § 85] the laws of the states where the banks are located . . . determine whether or not the banks can impose the foregoing fees and charges [including late fees] on Iowa residents," OCC Interpretive Letter No. 452, reprinted in 1988–1989 Transfer Binder, CCH Fed. Banking L. Rep. ¶ 85,676, p. 78,064 (1988). We doubt whether either of these statements was sufficient in and of itself to establish a binding agency policy—the former, because it was too informal, and the latter because it only purported to represent the position of the Deputy Chief Counsel in response to an inquiry concerning particular banks. Nor can it even be argued that the two statements *reflect* a prior agency policy, since, in addition to contradicting the regulation before us here, they also contradict one another—the former asserting that "interest" is a nationally uniform concept, and the latter that it is to be determined by reference to state law. What these statements show, if anything, is that there was good reason for the Comptroller to promulgate the new regulation, in order to eliminate uncertainty and confusion.

In addition to offering these reasons why 12 CFR § 7.4001(a) in particular is not entitled to deference, petitioner contends that *no* Comptroller interpretation of § 85 is entitled to deference, because § 85 is a provision that preempts state law. She argues that the "presumption against . . . pre-emption" announced in *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 518 (1992), in effect trumps *Chevron*, and requires a court to make its own interpretation of § 85 that

will avoid (to the extent possible) pre-emption of state law. This argument confuses the question of the substantive (as opposed to pre-emptive) *meaning* of a statute with the question of *whether* a statute is pre-emptive. We may assume (without deciding) that the latter question must always be decided *de novo* by the courts. That is *not* the question at issue here; there is no doubt that § 85 pre-empts state law. In *Marquette Nat. Bank of Minneapolis* v. *First of Omaha Service Corp.*, 439 U. S. 299 (1978), we dismissed petitioners' argument that the "exportation" of interest rates from the bank's home State would "significantly impair the ability of States to enact effective usury laws" with the observation that "[t]his impairment . . . has always been implicit in the structure of the National Bank Act . . . . [T]he protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court." *Id.*, at 318–319. What *is* at issue here is simply the meaning of a provision that does not (like the provision in *Cipollone*) deal with pre-emption, and hence does not bring into play the considerations petitioner raises.[3]

### III

Since we have concluded that the Comptroller's regulation deserves deference, the question before us is not whether it represents the best interpretation of the statute, but

---

[3] In a four-line footnote on the last page of her reply brief, and unpursued in oral argument, petitioner raised the point that deferring to the regulation in this case involving antecedent transactions would make the regulation retroactive, in violation of *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208–209 (1988). Reply Brief for Petitioner 20, n. 17. There might be substance to this point if the regulation replaced a prior agency interpretation—which, as we have discussed, it did not. Where, however, a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means.

whether it represents a reasonable one. The answer is obviously yes.

Petitioner argues that the late fees charged by respondent do not constitute "interest" because they "do not vary based on the payment owed or the time period of delay." Brief for Petitioner 32–33. We do not think that such a limitation must be read into the statutory term. Most legal dictionaries of the era of the National Bank Act did not place such a limitation upon "interest." See, e. g., 1 J. Bouvier, A Law Dictionary 652 (6th ed. 1856) ("The compensation which is paid by the borrower to the lender or by the debtor to the creditor for . . . use [of money]"); 2 A. Burrill, A Law Dictionary and Glossary 90 (2d ed. 1860); 11 American and English Encyclopedia of Law 379 (J. Merrill ed. 1890). But see J. Wharton, Law Lexicon or Dictionary of Jurisprudence 391 (2d Am. ed. 1860). The definition of "interest" that we ourselves set out in Brown v. Hiatts, 15 Wall. 177, 185 (1873), decided shortly after the enactment of the National Bank Act, likewise contained no indication that it was limited to charges expressed as a function of time or of amount owing: "Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money or as damages for its detention." See also Hollowell v. Southern Building & Loan Assn., 120 N. C. 286, 26 S. E. 781 (1897) ("[A]ny charges made against [the borrower] in excess of the lawful rate of interest, whether called 'fines,' 'charges,' 'dues,' or 'interest,' are in fact interest, and usurious").

Petitioner suggests another source for the asserted requirement that the charges be time- and rate-based: What is authorized by § 85, she notes, is the charging of interest "at the rate allowed" by the laws of the bank's home State. This requires, in her view, that the interest charges be expressed as functions of time and amount owing. It would be surprising to find such a requirement in the Act, if only because it would be so pointless. Any flat charge may, of course, readily be converted to a percentage charge—which

was indeed the basis for 19th-century decisions holding that flat charges violated state usury laws establishing maximum "rates." See, *e. g.*, *Craig* v. *Pleiss*, 26 Pa. 271, 272–273 (1856); *Hollowell, supra*, at 286, 26 S. E., at 781. And there is no apparent reason why home-state-approved percentage charges should be permissible but home-state-approved flat charges unlawful. In any event, common usage at the time of the National Bank Act prevents the conclusion that the Comptroller's refusal to give the word "rate" the narrow meaning petitioner demands is unreasonable. The 1849 edition of Webster's gives as one of the definitions of "rate" the "[p]rice or amount stated or fixed on any thing." N. Webster, American Dictionary of the English Language 910. To illustrate this sense of the word, it provides the following examples: "A king may purchase territory at too dear a *rate*. The *rate* of interest is prescribed by law." *Ibid.* Cf. 2 Bouvier, *supra*, at 421 (defining "rate of exchange" as "the price at which a bill drawn in one country upon another, may be sold in the former").

Finally, petitioner contends that the late fees cannot be "interest" because they are "penalties." To support that dichotomy, she points to our opinion in *Meilink* v. *Unemployment Reserves Comm'n of Cal.*, 314 U. S. 564, 570 (1942). But *Meilink* involved a provision of the Bankruptcy Act that disallowed debts owing to governmental entities "as a penalty," except for "the amount of the pecuniary loss sustained by the act . . . out of which the penalty . . . arose, with . . . such interest as may have accrued thereon according to law." *Id.*, at 566. Obviously, this provision uses "interest" to mean *only* that interest which is exacted as commercial compensation, and *not* that interest which is exacted as a penalty. A word often takes on a more narrow connotation when it is expressly opposed to another word: "car," for example, has a broader meaning by itself than it does in a passage speaking of "cars and taxis." In §85, the term "interest" is *not* used in contradistinction to "penalty," and

there is no reason why it cannot include interest charges imposed for that purpose. More relevant than *Meilink* is our opinion in *Citizens' Nat. Bank of Kansas City* v. *Donnell*, 195 U. S. 369 (1904), which did involve § 85 (or, more precisely, its predecessor, Rev. Stat. § 5197). There, a bank argued that a 12% charge on overdrafts did not violate a state law setting an 8% ceiling on interest rates because, *inter alia*, the overdraft charge "was a penalty because of a failure to pay a debt when due." *Id.*, at 373–374. We dismissed the argument out of hand: "The suggestions as to the twelve per cent charge on overdrafts do not seem to us to need answer." *Id.*, at 374.

\*     \*     \*

Petitioner devotes much of her brief to the question whether the meaning of "interest" in § 85 can constitutionally be left to be defined by the law of the bank's home State—a question that is not implicated by the Comptroller's regulation. Because the regulation is entitled to deference, and because the Comptroller's interpretation of § 85 is not an unreasonable one, the decision of the Supreme Court of California must be affirmed.

*It is so ordered.*