**W. Glenn TERRELL, Individually and on Behalf of All Other, Persons Similarly Situated, Plaintiffs,**

v.

**HANCOCK BANK and Hancock Holding Company, Defendants.**

No. 1:97CV201BrR.

United States District Court, S.D. Mississippi, Southern Division.

March 11, 1998.

---

Alfred Lee Felder, Alfred Lee Felder, Attorney, McComb, MS, Lawrence E. Abernathy, III, Lawrence E. Abernathy, III, Attorney, Laurel, MS, for Plaintiffs.

Rodney Douglas Robinson, David W. Crane, Allen, Vaughn, Cobb & Hood, Gulfport, MS, for Defendants.

### MEMORANDUM OPINION

BRAMLETTE, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment (docket entry # 15). After reviewing the motions, briefs, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds as follows:

### I.  FACTS

In the present case, the plaintiff, W. Glenn Terrell, filed a complaint against Hancock Bank and Hancock Holding Company, seeking recovery for overdraft and non-sufficient funds ("NSF") processing fees charged to his checking account for items presented and forced paid at the option of Hancock Bank when his account had insufficient funds.  The action arises out of events that began on or about August 9, 1989, when Terrell opened Joint Checking Account No. 01 310 283 1 with Hancock Bank. The signature card signed by Glen Terrell provides:

> The Depositor(s) whose name(s) appear above acknowledge receipt of a copy of the rules and regulations of the Hancock Bank entitled "Deposit Agreement", which rules and regulations pertain to all accounts established with the bank and hereby agree that the terms and provisions of such Agreement and all amendments thereto will govern the relationship of the parties. They also agree that this joint account is subject to the terms and provisions shown on the reverse hereof.

A Deposit Account Agreement clearly informed Terrell of Hancock Bank's options if he wrote a check on an account with insufficient funds:

M. OVERDRAFTS. The Bank may charge against the account, in the Bank's sole discretion, any item which is otherwise properly payable even though the charge creates an overdraft....

The Bank may determine whether or not the account contains sufficient funds to pay check or other item at any time between the time the check or other item is received by the Bank and the Bank's return deadline, and only one determination of the account balance is required. If that determination reveals insufficient funds to pay the check or other items, the Bank will not be required to honor the check or other item and may return it. Instead of dishonoring an insufficient funds check, the Bank may honor it and create an overdraft. However, the honoring of one or more overdrafts does not obligate the Bank to honor any future overdrafts. In enforcing the depositor's overdraft liability, the Bank may recover its reasonable attorney's fees, to the extent allowed by law.

The Hancock Bank Deposit Agreement also informed Terrell that he would be charged a processing fee whether each NSF item was paid or not.

On or about August 30, 1989, Terrell entered into a HandyLine Agreement with Hancock Bank to provide certain overdraft protection up to the limits of Terrell's established credit line. The HandyLine Agreement provides:

Upon approval you will be given written notification of your credit limit. We will make loans to you as follows: (1) In $100.00 multiple amounts sufficient to provide funds for the payment of any check, drawn upon designated Hancock Bank checking account and presented for payment, which exceeds the balance then in your Hancock Bank checking account, not to exceed the maximum credit line available hereunder to you, or (2) In amounts requested by you in writing, on forms provided by us, and approved by us, not to exceed the maximum credit line available hereunder to you. These loans will be made by us by depositing sums in your designated Hancock Bank checking account....

As the Hancock Bank "Deposit Account Agreement" and the "HandyLine Agreement" disclose, Terrell was governed by overdraft protection only to the amount of the limits of the HandyLine Agreement. Beyond said limits the customer would no longer have overdraft protection but would be subject to the terms and conditions of the "Deposit Account Agreement." That agreement clearly states that a $15.00 processing fee will be assessed to a customer who presents a check on an account with insufficient funds whether the check is honored or returned by Hancock Bank. Terrell had overextended the credit in his HandyLine account and had incurred overdraft and/or NSF charges through November 22, 1995.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is "no genuine issue as to any material facts and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The threshold inquiry, therefore, is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Put another way, "summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *McDermott Intern., Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). "Guesswork and speculation simply cannot serve as a basis for sending a case to a jury." *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996).

The Fifth Circuit has described the standard to be applied in summary judgment cases as follows:

If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting [summary judgment] is proper. On the other hand, if reasonable and fair-

minded men in the exercise of impartial judgment might reach different conclusions, [summary judgment] should be denied, and the case submitted to the jury. A mere scintilla is insufficient to present a question for the jury. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. The Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion for [summary judgment].

*Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 117–18 (5th Cir.1993) (citation omitted).

### B. TRUTH IN LENDING ACT

In count one of his complaint the plaintiff alleges violations of the Truth in Lending Act ("TILA"). Specifically, the plaintiff alleges that Hancock Bank violated TILA and its regulatory counterpart, Regulation Z, by failing to disclose the NSF processing fees charged to his account.

TILA is intended to promote the informed use of credit by requiring certain disclosures to consumers regarding the terms and cost of credit. 15 U.S.C. § 1604(a); 12 C.F.R. § 226.1(b). TILA provides that the Board of Governors of the Federal Reserve System shall promulgate appropriate regulations to carry out its purposes. 15 U.S.C. § 1604. Those regulations, commonly referred to as Regulation Z, are codified at 12 C.F.R. § 226. Among other things, TILA and Regulation Z require certain disclosures to be made regarding finance charges.

Regulation Z applies:

to each individual or business that offers or extends credit when four conditions are met: (i) the credit is offered or extended to consumers; (ii) the offering or extension of credit is done regularly; (iii) the credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (iv) the credit is primarily for personal, family, or household purposes.

12 C.F.R. 226.1(c).

■ Regulation Z defines "finance charge" as "the cost of consumer credit as a dollar amount. It includes any charge paid directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a). Regulation Z further states that "charges imposed by a financial institution for paying items that overdraw an account" are not finance charges, "unless the payment of such items and the imposition of the charge were previously agreed upon in writing." 12 C.F.R. § 226.4(c)(3). The commentary to Regulation Z provides that "a charge on an overdraft balance computed by applying a rate of interest to the amount of the overdraft is not a finance charge, even though the consumer agrees to the charge in the account agreement, unless the financial institution agrees in writing that it will pay such items." 12 C.F.R. § 226, Supplement I—Official Staff Interpretations, Paragraph 4(c)(3). Therefore, the language of Regulation Z itself provides that the fees at issue were not finance charges. However, an agreement in writing did exist between Terrell and Hancock Bank.

This agreement, however, provided for payment of overdraft charges only to the extent of the credit line granted to the customer under the HandyLine Agreement. In other words, by the terms of the HandyLine agreement, credit or a loan was extended to the plaintiff *but only to the extent of the limits of credit.* By the terms of the HandyLine credit limit there existed no additional overdraft protection, and the checking account became subject to the original terms of the "Deposit Account" agreement as to the charges for overdrawn accounts.

The plaintiff argues that he was charged both an NSF/overdraft fee as well as interest through the HandyLine Agreement for each overdraft paid. However, the plaintiffs statements show otherwise. If a check was written in excess of Terrell's HandyLine credit limit, Terrell was charged an overdraft/NSF fee on the amount of the check *not covered by the HandyLine Agreement.*

While within the credit limit of the Handy-Line Agreement, the plaintiff was charged interest only. When he exceeded the Handy-Line credit limit, he was charged the same amount for NSF processing fees or overdraft processing fees regardless of whether the check was honored (creating an overdraft) or returned (a non-sufficient fund status).

Since the processing fees were not finance charges and since the agreement provided for a an overdraft/NSF fee only on the amount of a check not covered by the Handy-Line Agreement, TILA and Regulation Z do not apply to the present action. Accordingly, as it pertains to count one, the defendants' motion for summary judgment should be granted.

### C. USURY

■ In count three of his complaint, the plaintiff alleges that the NSF processing fees are "interest" under the National Bank Act, and that the "interest" charged to him exceeds that allowed by Mississippi law. First, it should be noted that Hancock Bank is a state chartered bank, and thus the National Bank Act does not control. A state chartered bank has parity with a federally chartered bank; however, while the National Bank Act may be instructive as to Mississippi statutes on banking, Hancock Bank is not controlled by most of the requirements of these federal statutes. Nevertheless, even assuming the Act does apply, the plaintiffs usury claim must fail.

■ The term "interest" is defined under the National Bank Act as follows:

(a) Definition. The term "interest" as used in 12 U.S.C. § 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees *connected with credit extension or availability:* numerical periodic rates, late fees, not sufficient funds (NSF) fees, over-limit fees, annual fees, cash advance fees, and membership fees....

12 C.F.R. § 7.4001(a) (1997) (emphasis added). Because the NSF fees were not imposed in connection with a credit transaction, the fees are not interest as defined by the National Bank Act. It is clear that the fee arises from the terms of the Depository Agreement. These kinds of charges are addressed by 12 C.F.R. § 7.4002, which provides:

(a) Customer charges and fees. A national bank may charge its customers non-interest charges and fees, including deposit account service charges....

(b) Considerations. The establishment of non-interest charges and fees, and the amounts thereof, is a business decision to be made by each bank, in its discretion, according to sound banking judgment and discretion, according to sound banking judgment and safe and sound banking principles. A bank reasonably establishes non-interest charges and fees if the bank considers the following factors, among others:

(1) The cost incurred by the bank, plus a profit margin, in providing the service;

(2) The deterrence of misuse by customers of banking services;

(3) The enhancement of the competitive position of the bank in accordance with the bank's marketing strategy; and

(4) The maintenance of the safety and soundness of the institution.

(c) Interest. Charges and fees that are "interest" within the meaning of 12 U.S.C. § 85 are governed by § 7.4001 and not by this section.

The NSF processing fees charged by Hancock Bank are precisely those described in § 7.4002. Moreover, the NSF fees at issue substantially satisfy the above reasonableness factors. *See Wallace v. Bank of Bartlett,* 55 F.3d 1166 (6th Cir.1995) (addressing similar factors set forth by repealed 12 C.F.R. § 7.8000).

■ Terrell also alleges that the NSF fees are a violation of Mississippi's usury laws. Terrell alleges that the fees violate section 75-17-1 of the Mississippi Code. That section provides in pertinent part:

Any borrower or debtor may contract for and agree to pay a *finance charge* for any loan or other extension of credit made directly or indirectly to a borrower or debtor which will result in a yield not to exceed the greater of ten percent (10%) per annum or five percent (5%) per annum above the discount rate.... (emphasis added).

However, the fees at issue in the present action are not considered finance charges under the statute's definition. Under Mississippi law, a finance charge is defined as:

> [T]he amount or rate paid or payable, directly or indirectly, by a debtor for receiving a loan or incident to or as a condition of the extension of credit, including, but not limited to, interest, brokerage fees, finance charges, loan fees, discount points, service charges, transaction charges, activity charges, carrying charges, time price differential, finders fees or any other cost or expense to the debtor for the services rendered or to be rendered to the debtor in making, arranging or negotiating a loan of money or extension of credit....

Miss.Code Ann. § 75–17–25 (1991).

Just as with the TILA claim discussed *supra*, the plaintiffs usury claim cannot stand unless the fees were a charge "for receiving a loan or incident to or as a condition of the extension of credit."[1]

This issue was addressed by the Texas Supreme Court in *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285 (Tex. 1994). There, the Texas Supreme Court described the issue as "whether a bank's fee for checks drawn on an account with insufficient funds ["NSF fee"] constitutes usury." *First Bank*, 877 S.W.2d at 285.

In *First Bank*, Tony's Tortilla Factory, Inc. had two checking accounts with First Bank, an operating account and a payroll account. *Id.* at 286. In December 1984, these accounts were overdrawn—the operating account by $72,000, and the payroll account by $16,000. *Id.* Between April and December 1984, Tony's wrote 2,165 checks for which there were insufficient funds in the accounts. *Id.* Between April and December 1984, First Bank imposed NSF fees of $20.00 per check against Tony's totaling $47,600.00. *Id.* During this period First Bank advanced $1,124,- 984.99 to cover the checks. *Id.*

In determining whether the NSF fees constituted interest, the Texas Supreme Court noted that "[f]ees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws." *Id.* at 287. The Court continued:

> Each NSF fee was separate and additional consideration for processing each bad check. Thus, the NSF fee was for consideration other than the lending of money. Separate consideration was given to First Bank for the funds advanced to cover the bad checks. The separate consideration was not the NSF fee, but was Tony's implied promise to repay that advance.

*Id.* at 288 (citations omitted). Although the decision is not binding, the Court finds that *First Bank*, cited with approval by the OCC, provides persuasive authority regarding how the Mississippi Supreme Court would likely resolve the issue of whether the NSF fee is subject to Mississippi's usury laws.

Accordingly, the Court finds that the plaintiffs usury claims must fail.

### D. RICO

In count six of his complaint, Terrell alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Terrell alleges that Hancock Bank and Hancock Holding Company entered into a pattern of racketeering activity

---

1. In his response, the plaintiff relies heavily on *Smiley v. Citibank*, 517 U.S. 735, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). In *Smiley*, the Supreme Court approved the OCC's definition of "interest" found in § 7.4001. The definition of "interest" under § 7.4001 does include a reference to NSF charges. However, § 7.4001 clearly provides that NSF fees are interest if, and only if, the fee is a "payment compensating a creditor ... for an extension of credit." In the present case, the NSF fees charged to Terrell were not payments compensating the bank for an extension of credit. The fees were charged for processing bad checks. Thus, *Smiley* does not apply.

by mail and fraud and wire fraud in a scheme to collect usurious interest charges with respect to borrowers.

RICO provides plaintiffs with a private civil action to recover treble damages for injury "by reason of a violation of [18 U.S.C.] section 1962." 18 U.S.C. § 1964(c). Among the activities that constitute violations of § 1962 is the conducting of an *enterprise* through a pattern of racketeering activity. 18 U.S.C. § 1962(c). RICO defines "racketeering activity" to include, among others, any act "indictable" under numerous federal criminal provisions, including mail and wire fraud (so-called "predicate acts"). 18 U.S.C. § 1961(1)(B). A "pattern of racketeering activity" is defined as two or more "acts of racketeering" occurring within ten years of each other.

◼ In the present case, the defendants argue that the RICO count should be dismissed because the plaintiff has failed to allege an "enterprise" separate and distinct from that person sought to be held liable. The Fifth Circuit in *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438 (5th Cir. 1987) addressed this issue. There the Court wrote:

> The existence of an enterprise is an essential element of a RICO claim. 18 U.S.C. § 1962(c); *Sedima v. Imrex Co.*, 473 U.S. 479, 496–98, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). To establish an "association in fact" enterprise under 18 U.S.C. § 1961(4) plaintiffs must show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *Shaffer v. Williams*, 794 F.2d 1030, 1032 (5th Cir.1986). The enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529.

*Atkinson,* 808 F.2d at 440–41.

In *Atkinson,* the defendant bank loaned the plaintiffs money to finance their cattle business. *Id.* at 439. The plaintiffs eventu-

ally filed a lawsuit against the bank, its holding company, and three employees, alleging civil RICO violations and the charging of usurious interest. *Id.* The jury found that the bank had indeed committed mail fraud by mailing false and fraudulent statements of the interest owed on the loans. *Id.* The miscalculation of interest was due to the fact that the bank had charged the plaintiffs a rate of interest based on the local prime rate of the National Bank of Oklahoma City instead of the lower national prime rate, which the promissory notes and loan agreements contemplated. *Id.* at 440.

In setting aside the jury's verdict of a RICO violation, the Court explained:

> The record here contains no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank. Plaintiffs wholly failed to establish the existence of any entity separate and apart from the bank. In this case, the alleged racketeering activity forming the predicate of the RICO charge was mail fraud—the mailing of false statements requesting payment of interest in excess of the agreed amount. The mailing of loan statements was an activity of the bank. There is no evidence of any other activity on the part of the alleged enterprise.

*Id.* at 441.

As in *Atkinson,* the plaintiff in the present case has failed to establish that Hancock Bank and Hancock Holding Company were associated in any manner apart from the activities of the bank. Clearly, the mailing of the notices regarding the accounts at issue was an activity of the bank. Similarly, any wire communications alleged to have occurred were directly related to bank activities. Simply put, there is no evidence to support a RICO violation. There is no evidence to show that Hancock Bank and Hancock Holding Company were an association in fact enterprise separate and distinct from the bank.

## E. STATE CLAIMS

◼ All other claims asserted by the plaintiff are brought pursuant to state law, and

therefore are not properly before this Court in the absence of any viable federal claim. The district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). For this reason, the Court finds that the remainder of the plaintiffs claims should be dismissed without prejudice.

## III. CONCLUSION

For the foregoing reasons, the Court finds that the defendants' motion for summary judgment should be granted as to all federal counts. Since the Court will not exercise supplemental jurisdiction, the state counts shall be dismissed without prejudice. In accordance with Rule 58 of the Federal Rules of Civil Procedure, a separate judgment in conformity with and incorporating by reference the foregoing Memorandum Opinion shall issue. Each party shall bear their respective costs.