VIDEO TRAX, INC., a Florida corporation on behalf of itself and all other persons and entities similarly situated, Plaintiff,

v.

NATIONSBANK, N.A., a national banking association, Defendant.

No. 97–1586–CIV.

United States District Court, S.D. Florida.

Dec. 10, 1998.

Scott Alan Silver, Miami, FL, for plaintiff.

Bradford Swing, Miami, FL, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE is before the Court upon cross motions for summary judgment by Plaintiff, Video Trax, Inc. ("Plaintiff"), and Defendant NationsBank, N.A. ("Defendant"). Plaintiff brought this class action pursuant to the National Bank Act, 12 U.S.C. §§ 85 and 86 (the "Bank Act"). Plaintiff alleges that the Overdraft Item Fee (the "OD fee") on checking accounts charged by Defendant, a national banking association, was actually a subterfuge to exact a usurious rate of interest in violation of the Bank Act. Defendant avers that the OD fee was an administrative cost to cover the processing of checks drawn in excess of the collected balance in a depositor's account, and was not interest as contemplated by the Bank Act and Florida's usury statute, §§ 687.01, et seq., Fla.Stat. Therefore, according to Defendant, since the OD fee is not "interest," it is not usurious.

The parties request the Court to determine, as a matter of law, whether the OD fee is really interest, based on an extension of credit to cover checks in excess of Plaintiff's uncollected balance in its business checking account. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331, as arising under federal law. After careful consideration of the parties' arguments, the relevant case law and the record as a whole, and being otherwise advised in the premises, the Court concludes that the contested charges do not constitute interest, and thus, the transaction was not usurious.

## I. Factual and Procedural Background

The parties concede that no disputed issues of fact exist to preclude judgment as a matter of law. The undisputed facts in the record reveal that Defendant is a nationally chartered banking institution, organized and existing under the laws of the United States.[1] At all relevant times, Defendant was authorized to transact, and was transacting, business in branch offices located in the State of Florida.

Plaintiff is a corporation organized under the laws of the State of Florida.[2] At all times relevant to this cause, Plaintiff was authorized to do business, and was conducting business, in Dade County, Florida.

On June 10, 1992, Plaintiff opened a Simple Analysis Business Checking account at NCNB National Bank of Florida, N.A., Defendant's predecessor. The obligations of the parties were governed by the signature cards, deposit agreements, and schedules of fees in effect from the inception of the account until the account was terminated on February 18, 1997.

As evidenced by the account agreement, Plaintiff agreed in writing to pay a flat fee when a check presented to Defendant for payment exceeded the collected balance in Plaintiff's account. In addition, Defendant

---

1. Under our dual banking system, commercial banks have the option of being federally or state chartered. Federally chartered, or national, banks are governed by the National Bank Act of 1874, 12 U.S.C. §§ 21, et seq., which sets forth chartering criteria, basic banking and investment powers, lending and borrowing limitations, and corporate powers and duties. As required members of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation ("FDIC"), national banks are also subject to the Federal Reserve Act, 12 U.S.C. §§ 221–522, and the FDIC Act, 12 U.S.C. §§ 1811, et seq.

2. On February 2, 1998, the Court entered an agreed order pursuant to the parties' Joint Stipulation and Agreement Regarding Class Certification. It was agreed that the class would be defined as the holders of commercial and other non-consumer business deposit accounts opened in Florida with Defendant, and its predecessors, who at any time during the two years preceding commencement of this action on May 20, 1997, were charged interest and/or OD fees or similar fees as a result of the presentment and payment of checks drawn on their respective accounts at times when uncollected or insufficient funds existed in the accounts, which interest and/or OD fees, if legally required to be included for the purpose of calculating interest, would result in a usurious rate of interest. Notice to the class was deferred until such time as the Court deemed necessary for notice to be extended to potential class members. As of this date, no notice has been forwarded, nor has the Court been requested to address the issue.

charged interest on overdraft sums to the extent those sums exceeded collected balances in Plaintiff's account.[3] The rate of interest charged was Defendant's prime rate plus 3%, and was subject to the maximum rate permissible by law.

Throughout the history of the parties' banking relationship, several checks were presented for payment against Plaintiff's account when the account contained insufficient funds to cover the checks. Pursuant to the deposit agreements and the bank's policies, which policies were incorporated into the deposit agreement between the parties, Defendant exercised its option to either honor or dishonor the checks. If a check was honored, an overdraft was permitted to exist in Plaintiff's account. If Defendant chose not to honor the check, it was returned unpaid. Plaintiff's account history reflects that, pursuant to this practice, out of a total of 212 checks presented when insufficient funds existed in Plaintiff's account, ninety-two checks were honored, while 120 checks were returned.

According to Defendant's schedule of fees, a flat, per item fee was charged against Plaintiff's account whether the check was honored or returned. From January 1, 1995 through June 31, 1995, checking account customers, including Plaintiff, were charged a flat fee of $25 for all overdrafts or checks returned for insufficient funds. That fee increased to $27 from July 1, 1995 through the duration of Plaintiff's relationship at Defendant's institution. There was no relation between the flat fee charged and the amount of the check, overdraft, or period of time the overdraft existed in the account. The interest charged against the account for overdrafts was calculated on the basis of the average daily overdrawn account balance.

Plaintiff alleges that the periodic charges for interest, when aggregated with the overdraft fees, constitute "interest" in excess of the lawful amount allowed under the Bank Act. According to Plaintiff, Defendant assessed "interest" in excess of $18,000 on an average annual overdraft balance of approximately $6,000, a total of over 300% in interest.

Upon Plaintiff's demand for the "excess interest," Defendant refused to refund any monies, on the basis that the "not sufficient fund fee" (the "NSF fee") and the OD fee were administrative charges, commonly utilized in the banking industry to cover processing charges and to deter depositors from overdrawing their accounts. Defendant contends that NSF and OD fees do not constitute "interest" within the meaning of the usury provisions of the Bank Act, and therefore, Plaintiff cannot avoid its contractual obligations by claiming protection under the usury laws.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one that might *affect* the outcome of the suit under the governing law. *Id.* A plaintiff cannot defeat a defendant's properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings. *Id.* A mere scintilla of evidence is insufficient to defeat a motion for summary judgment:

> [I]n every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

*Id.* at 251, 106 S.Ct. 2505. In reviewing a motion for summary judgment the court focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

---

**3.** An overdraft is the payment by a bank from its funds of a check drawn on it by a depositor who does not have sufficient funds on deposit to pay the check. *See* 1 Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks: The Law of Bank Checks* ¶ 19.01, at 19–2 (rev. ed.1997).

one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra*).

In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court established a two-prong framework of shifting burdens which must be employed by federal courts in determining whether there exists a genuine issue precluding summary judgment. This framework places the initial burden on the moving party to establish the absence of a genuine issue as to any material fact. *Tyson Foods, Inc.,* 121 F.3d at 646 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). The moving party may discharge this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U .S. at 325, 106 S.Ct. at 2554. In deciding whether the burden has been satisfied, the Court must view the evidence and all reasonable inferences arising from it in the light most favorable to the nonmoving party. *Tyson Foods, Inc.,* 121 F.3d at 646 (citing *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608).

Once the movant has satisfied its burden, the burden shifts to the nonmoving party to present evidence sufficient to make a "showing that the jury could reasonably find for that party." *Allen,* 121 F.3d at 646 (citations omitted). Facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir.1981). However, where the nonmoving party bears the burden of proof of an essential element to that party's case, summary judgment is warranted when the party fails to make a showing sufficient to establish the essential element. *Celotex,* 477 U.S. at 323, 106 S .Ct. at 2552. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Eleventh Circuit commented on the nonmovant's burden:

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrating an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–17 (11th Cir.1993). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tyson Foods, Inc.,* 121 F.3d at 646.

## III. Analysis and Discussion

The Amended Complaint, although not delineated as such, consists of a single count alleging that Defendant's practice of charging OD fees, in addition to assessing interest against the average daily overdrawn account balance, constituted usury. The parties agree that the sole issue for determination is whether the OD fee was really "interest" that, when aggregated with the interest charged on the average daily overdrawn balance, was usurious.

Plaintiff does not challenge the interest rate charged against the average daily balance. Plaintiff only seeks a ruling that, since an overdraft situation amounted to an extension of credit—like a loan—the OD fee was actually "interest." Plaintiff argues that Defendant's characterization of the OD fee as

an administrative processing fee is pretext, because the amount of the fee exceeded the amount necessary for processing checks presented against an overdrawn account. Thus, the Court addresses only the character of the OD fee and the propriety of Defendant's practice in assessing such fees.

Several issues must be addressed to reach a decision on the character and propriety of Defendant's OD fee. First, the Court must determine the controlling law for characterizing the fee. Plaintiff contends that, since Defendant is a nationally chartered bank, federal law, specifically the Bank Act and case law interpreting the Bank Act, applies, and that federal law preempts state law except as to the rate of interest the state allows a bank to charge its customers. Defendant avers that state law is not totally preempted. Defendant argues that state law governs not only the rate of interest which banks may legally charge, but also controls what constitutes "interest," as opposed to non-interest, administrative charges.

The second issue relative to resolving this non-factual dispute, which is dependent on the resolution of the preceding issue, is what is included within the meaning of "interest." Third, the Court must determine whether the payment of checks presented against an overdrawn account is an extension of credit, creating a loan transaction to which usury laws apply. The fourth, and ultimate, issue for the Court is whether the OD fees charged by Defendant are usurious, and whether any of the elements establishing usury require factual determinations, thereby precluding judgment as a matter of law and necessitating a trial.

Neither the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, nor any district courts therein, including the Southern District of Florida, nor any Florida state court have squarely addressed the specific issue before the Court. Although this action presents a case of first impression within this jurisdiction, ample analogous precedent exists to support the conclusion that Defendant's OD fees are not interest which would create a usurious rate. Moreover, federal district courts within other circuits which have analyzed the difference between interest and administrative charges assessed by national banks have reached the same conclusion, and are persuasive. *See, e.g., Nicolas v. Deposit Guar. Nat'l Bank,* 182 F.R.D. 226 (S.D.Miss.1998); *Beech v. Trustmark Nat'l Bank,* No. 97cv187GR (S.D.Miss. Jan. 13, 1998).

### A. The Purpose Behind the National Bank Act

■ The National Bank Act was enacted to equalize the standing of national banks with their state-chartered competitors, and to prevent state legislatures from discriminating against national banks. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 314, 99 S.Ct. 540, 548, 58 L.Ed.2d 534 (1978) (Congressional intent in providing that national banks "may ... charge ... interest at the rate allowed by the laws of the State, Territory or District where the bank is located, ... and no more" was to allow national banks to compete with state-chartered banks and to give certain "advantages to National banks over their State competitors."). Section 85 of the Bank Act prescribes the amount of interest that a national bank may charge:

> Any association may take, receive, reserve, and charge on any loan ... interest at the rate allowed by the laws of the State ... where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more ...

12 U.S.C. § 85. The remedy for charging a rate of interest in excess of that prescribed under § 85, which is regarded as usurious, is the "forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon." 12 U.S.C. § 86.

### 1. *The National Bank Act Does Not Absolutely Preempt State Usury Laws*

■ Plaintiff contends that, as a nationally chartered bank, Defendant's practices are governed solely by federal law, and that state law only controls the actual rate of

interest, not what constitutes "interest" in the context of usury prohibitions. However, the Bank Act does not contain an express statement that Congress intended to preempt state law in its entirety. In the absence of express statutory preemption, conflict preemption may be implied where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to achieving the intent of Congress. *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995). As with express preemption, conflict preemption will not be found unless it is the clear intent and purpose of Congress. *See CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993); *see also California v. ARC America Corp.,* 490 U.S. 93, 100–01, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989) (preemption of state law can be found only when "Congress intends that federal law occupy a given field," or when state law "actually conflicts with federal law, that is, when compliance with both state and federal law is impossible ... or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (quoting sources omitted).

■ Banking is not an area in which Congress has evidenced an intent to occupy the entire field to the exclusion of the states, and thus, state legislatures may legislate in all areas not expressly or impliedly preempted by federal legislation. *See, e.g., Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 38, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980); *First Nat'l Bank v. Missouri,* 263 U.S. 640, 656, 44 S.Ct. 213, 215, 68 L.Ed. 486 (1924). In fact, federal courts have recognized that "national banks have traditionally been governed in their daily course of business far more by the laws of the State than of the Nation. All [of] their contracts are governed and construed by State laws." *National Bank v. Commonwealth,* 76 U.S. (9 Wall.) 353, 362, 19 L.Ed. 701 (1869). Except for a few instances in which Congress has explicitly preempted state regulation of national banks, "regulation of banking has been one of dual control since the passage of the first National Bank Act in 1863." *National State*

*Bank v. Long,* 630 F.2d 981, 985 (3d Cir. 1980). Thus, the rule is that state laws apply, "the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge [their] duties...." *McClellan v. Chipman,* 164 U.S. 347, 357, 17 S.Ct. 85, 87, 41 L.Ed. 461 (1896); *see also Anderson Nat'l Bank v. Luckett,* 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692 (1944) ("national banks are subject to state laws, unless those laws infringe the national banking laws or impose undue burden on the performance of the banks' functions").

■ Since Congress has not displaced all state legislation affecting national banks, state law will be preempted only "to the extent that it actually conflicts with federal law." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). Courts must not lightly infer preemption, and it is the burden of the party claiming Congress intended to preempt state law to prove it. *See Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (the authority to displace a sovereign state's law is "an extraordinary power ... that we must assume Congress does not exercise lightly"); *see also Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress.").

### 2. Interpreting the Lawful Rate of Interest Under the National Bank Act

■ Through the Bank Act, Congress established a general system of regulations governing nationally-chartered banks and adopted state laws only as they fixed the amount of interest which could be charged. *See Evans v. National Bank of Savannah,* 251 U.S. 108, 111, 40 S.Ct. 58, 59, 64 L.Ed. 171 (1919). Although federal laws are frequently intended to have uniform nationwide

application, Congress may provide that federal enactments be interpreted by reference to state law. *See Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 43, 109 S.Ct. 1597, 1605, 104 L.Ed.2d 29 (1989). "Congress sometimes intends that a statutory term be given content by the application of state law." *Id.* In such instances, a federal court may properly use state law to fill in the gaps within a federal legislative scheme. *See, e.g., Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 107–09, 111 S.Ct. 1711, 1722–23, 114 L.Ed.2d 152 (1991).

█ Plaintiff's assertion that state laws limiting bank service charges are preempted by the Bank Act's comprehensive federal statutory scheme governing the deposit-taking function of national banks is palpably erroneous. There is no comprehensive federal statutory scheme governing the taking of deposits. Only one section of the Bank Act even relates to this function, and merely authorizes banks to accept deposits. *See* 12 U.S.C. § 24. This section may, by implication, also authorize banks to charge for deposit-related services as an incidental power necessary to carry on the business of receiving deposits. But such implied authority does not constitute a regulatory scheme so comprehensive as to displace state law. *See Joy v. North,* 519 F.Supp. 1312, 1323 (D.Conn.1981), *reversed on other grounds,* 692 F.2d 880 (2d Cir.1982), *cert. denied sub nom., Citytrust v. Joy,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983) ("This section [12 U.S.C. § 24] simply sets forth the general corporate powers of associations. It does not provide that the powers therein are meant to preempt state law.").

The parties do not dispute that § 85 of the Bank Act expressly preempts all attempts by state legislatures to regulate the rate of interest which a national bank may charge in connection with a loan. The disagreement between the parties arises over the items and charges which are encompassed within the definition of the term "interest." "The question, at bottom, is one of statutory intent, and we accordingly 'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'"

*Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 382, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) (quoting *FMC Corp. v. Holliday,* 498 U.S. 52, 57, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990)). Thus, the issue of whether Florida law has been preempted by §. 85 of the Bank Act necessarily involves a determination of the intent of Congress when it employed the term "interest" in drafting the Bank Act.

**B. The Meaning of "Interest" As Contemplated in the Usury Prohibitions**

Plaintiff alleges that the OD fees are "interest" under the Bank Act, and that the "interest" charged by Defendant, in the form of OD fees, exceeds that allowed by Florida law. Thus, Plaintiff alleges that Defendant's practices are usurious.

██ The Bank Act does not expressly define "interest rate" or "rates of interest" as used in § 85. Moreover, there is nothing in the legislative history of the Bank Act from which to glean a possible congressional intent to include the OD fees at issue within the definition of "interest." In the absence of an express definition or clear congressional intent, it is incumbent upon the Court to "begin with the language employed by Congress," and assume that the ordinary meaning of "interest" accurately expresses legislative purpose. *Morales,* 504 U.S. at 382, 112 S.Ct. at 2036; *see also CSX Transportation,* 507 U.S. at 664, 113 S.Ct. at 1737; *FMC Corp.,* 498 U.S. at 57, 111 S.Ct. at 407. "[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country[,] they are presumed to have been used in that sense unless the context compels to the contrary." *Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978). Courts interpreting the meaning of "interest" must apply a "strict, that is literal construction" to avoid subjecting banks to double interest penalties under the Bank Act. *See Tiffany v. National Bank of Missouri,* 85 U.S. (18 Wall.) 409, 410, 21 L.Ed. 862 (1873).

Interest has been understood to include any compensation allowed by law or fixed by the parties for the use or forbearance of

money, or the price which is fixed for the use of money. *See Deputy v. DuPont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940). The common definition of "interest rate" has been held to be thé "percentage of an amount of money which is paid for its use for a specified time." *Black's Law Dictionary* 730 (5th ed.1979). Similarly, "interest" has been defined as "a charge for borrowed money[,] generally *a percentage of the amount borrowed." Webster's Ninth New Collegiate Dictionary* 630 (1989) (emphasis added). The plain and ordinary meaning of "interest" or "interest rate" does not include OD fees, NSF fees, and similar contingent or default charges. *See, e.g., United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 328, 83 S.Ct. 1715, 1722, 10 L.Ed.2d 915 (1963) (charges for banking services, "such as service charges for checking privileges, are free of governmental regulation, state or federal"); *see also Lloyd v. Scott,* 29 U.S. (4 Pet.) 205, 226, 7 L.Ed. 833 (1830).

The determination of the maximum amount of interest which may be charged for the use of money loaned has always been within the police power of the state, and the details of and exceptions to the legislation have rested within the discretion of the state legislature. *See Griffith v. Connecticut,* 218 U.S. 563, 568–69, 31 S.Ct. 132, 133, 54 L.Ed. 1151 (1910). In § 85 of the Bank Act, Congress expressly and unambiguously stated that a national bank was subject to the interest provision of the laws of the state in which the bank was located. Accordingly, Congress may look to the laws of the states to define the term "interest," as well as to set the allowable rate of interest. *See Tikkanen v. Citibank (South Dakota) N.A.,* 801 F.Supp. 270, 278 (D.Minn.1992).

**1. *Overdraft Fees on Demand Deposit Checking Accounts Are Not "Interest"***

 Even assuming that the Bank Act preempts state law regarding the characterization of interest considered usurious, which the Court does not concede is appropriate,

Plaintiff's claim that the OD fees are interest and therefore are subjected to usury laws must fail. As a threshold matter, except as the term "interest" relates to credit transactions, such as loans or credit card services, no provision of federal law discusses bank charges for NFS checks, or, for that matter, bank charges for any service performed for depositors of checking accounts.

"Interest" as used in the Bank Act includes:

> any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees. . . .

12 C.F.R. § 7.4001(a) (1997). Because the OD fees were not imposed in connection with a credit transaction, the fees are not interest as defined by the Bank Act.[4] Rather, the fee arises from the terms of the deposit agreements, which incorporate the schedule of fees. These types of charges are addressed by 12 C.F.R. § 7.4002, which provides:

> (a) *Customer charges and fees.* A national bank may charge its customers non-interest charges and fees, including deposit account service charges. . . .
>
> (b) *Considerations.* The establishment of non-interest charges and fees, and the amounts thereof, *is a business decision to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles.* A bank reasonably establishes non-interest charges and fees if the bank considers the following factors, among others:
>
> (1) The cost incurred by the bank, plus a profit margin, in providing the service;
>
> (2) The deterrence of misuse by customers of banking services;

---

4. Although Plaintiff contends that the OD fees were actually imposed in exchange for the extension of credit for honoring a check drawn on accounts with insufficient collected balances, the Court has found otherwise. This finding is addressed in detail *infra.*

(3) The enhancement of the competitive position of the bank in accordance with the bank's marketing strategy; and

(4) The maintenance of the safety and soundness of the institution.

(c) *Interest.* Charges and fees that are "interest" within the meaning of 12 U.S.C. § 85 are governed by § 7.4001 and not by this section.

The OD fees charged by Defendant are precisely those described in § 7.4002.

██ Moreover, the fees at issue substantially satisfy the reasonableness factors set forth in 12 C.F.R. § 7.4002(b). Defendant's "Noninterest Income Project" report states that the bank's primary concern "is the extensive daily aggregate work effort by the branches and officers expended in the processing of NSF/OD transactions ... [which] requires substantial review and intervention by the branches and officers." Defendant determined that the decision to pay or return a check "sends a distinct message to the customer as to whether their behavior is to be encouraged or discouraged."

██ Analyzing the pattern of customer behavior and recognizing the additional financial risk to the bank, Defendant concluded, that, since the majority of the potential overdraft checks are eventually honored, and the fact that the bank receives no additional fees when the item is presented a second time, honoring the check the first time provides little additional risk. Nevertheless, Plaintiff challenges Defendant's application of the considerations prescribed in § 7.4002(b), claiming that the fees are excessive for the services rendered. Plaintiff alleges that the cost analysis, based on the amount of the OD fee and the actual expense

incurred by Defendant for processing an overdrawn check, does not justify the amount of the fee imposed. However, Plaintiff has presented *no* evidence to substantiate its accusation that the OD fees were unconscionable and were imposed in contravention of the considerations required for analyzing and assessing the propriety of the fees.[5]

Even if Plaintiff proffered competent evidence of profit percentages, such evidence does not automatically prove that the fees were unreasonable. In fact, the Code of Federal Regulations permit nationally chartered banks to recover the "cost incurred" for processing bad checks, "plus a profit margin." 12 C.F.R. § 7.4002(b)(1).

Additionally, national banks are required to set non-interest charges and fees based on the "maintenance of the safety and soundness of the institution." 12 C.F.R. § 7.4002(b)(4). Defendant's OD fees are a fair and efficient method of allocating the administrative costs consequent to processing checks presented against insufficient funds. Depositors who maintain insufficient balances create operational costs directly attributable to their failure to comply with the terms of their agreement. Banks must adopt systems to track such behavior and respond to it appropriately. Since banks must refrain from engaging in unsafe and unsound practices, *see* 12 U.S.C. § 1818(e), it is more than conceivable that a charge for overdrawn checks which is low enough to avoid attack as unreasonable would fail to discourage the writing of such checks.[6]

## 2. Defendant's OD Fees Are Not Interest Under Florida Law

The Office of the Comptroller of the Currency has declared that the federal definition

**5.** Plaintiff complains that Defendant has not produced documentation of cost versus profit analysis. However, 12 U.S.C. § 484 provides that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal Law." Cases construing this section do not clarify when an unauthorized person or agency may, without violating this section, examine bank records for a limited purpose. *Compare Guthrie v. Harkness,* 199 U.S. 148, 157–59, 26 S.Ct. 4, 7–8, 50 L.Ed. 130 (1905) *with National State Bank v. Long,* 630 F.2d 981, 989 (3d Cir.1980). Thus, it is possible that § 484 may serve to limit Plaintiff's ability to examine records by way of discovery. Nevertheless, Defendant has represented

that the cost analysis records requested by Plaintiff do not exist. Therefore, Plaintiff was required to support its argument of the unreasonableness of the amount of the OD fee using other methods.

**6.** The OCC has the authority to enjoin a bank service charge, or any other act of a national bank, considered to be an unsafe or unsound practice. *See* 12 U.S.C. § 1818(b). The Court is unaware of any instance in which this authority has ever been used to curb excessive bank charges.

of "interest" does not take precedence over the manner in which states define the term. *See* 12 C.F.R. § 7.4001(c) ("The Federal definition of the term 'interest' does not change how interest is defined by the individual states (nor how the state definition of interest is used) solely for purposes of state law."). Therefore, if certain fees are not considered interest "for purposes of evaluating compliance with state usury limitations ... when calculating the maximum interest that lending institutions may charge under those limitations," such fees are not deemed to be interest under federal law. *Id.*

▉ Applying Florida law, the OD fee charged by Defendant for the presentment of checks against an overdrawn account is not interest for the purpose of determining whether a transaction is usurious. Although the terms "fee" and "charge," in their legal acception, have a very broad meaning, as used generally, they refer to a price demanded for services rendered, "to fix or demand such a price, or any act by which the charging party manifests his purpose to demand the amount fixed or allowed for the [service]." *Benson v. First Trust & Savings Bank*, 105 Fla. 135, 142 So. 887, 891 (Fla. 1932).

Contrary to Plaintiff's assertion, Florida's formula for calculating interest on loans and credit advances belies the fact that Defendant's OD fees are a subterfuge for excessive interest. The rate of interest on Florida transactions is:

> calculated by first computing the advance or forbearance *as a percentage of the total stated amount of such loan....* This percentage shall then be divided by the number of years, and fractions thereof, of the loan ... *according to its stated maturity date, without regard to* early maturity in the *event of default.* The resulting annual percentage rate shall then be added to the stated annual percentage rate of interest to produce the effective rate of interest for purposes of this chapter.

§ 687.03(3), Fla.Stat. (emphasis added).

The clear language of § 687.03(3) refers to the particular term stated on the face of a loan document. The statute explicitly states that the calculation of unlawful rates of interest "shall apply only to loans and advances of credit." § 687.03(2)(b), Fla.Stat. Thus, Plaintiff's usury claim cannot stand unless Defendant's OD fees were a charge for receiving a loan or were incident to or a condition for the extension of credit.

## C. Honoring Checks on Overdrawn Accounts Is Not an Extension of Credit

Plaintiff argues that, by honoring checks for which insufficient funds exist in a checking account, Defendant was actually extending credit to Plaintiff. This extension of credit, according to Plaintiff, is synonymous with a loan. Therefore, the OD fee assessed on these "loans" constitutes interest. Accordingly, since the OD fee charged by Defendant exceeded the lawful rate of interest permitted in Florida, it was usurious.

Plaintiff relies heavily on *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996), to support its contention that a loan was extended in connection with its checking account. The Court finds Plaintiff's reliance on *Smiley* is misplaced.

The *Smiley* Court unanimously held that the word "interest" in § 85 was ambiguous and that the Comptroller's judgment as to its meaning was entitled to deference under the principles set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Smiley,* 116 S.Ct. at 1732–33; *Doe v. Norwest Bank Minnesota, N.A.,* 107 F.3d 1297, 1301–02 (8th Cir.1997). The Court then concluded that the OCC's inclusion of credit card late fees within the meaning of "interest" was a reasonable interpretation of the statute. *Smiley,* 116 S.Ct. at 1735. Because the law of South Dakota, Citibank's home state, permitted banks to charge late fees, the determination that late fees are interest for purposes of the Bank Act led to the dismissal of the state-law claims of Smiley, a California resident. *See id.* at 1732.

Here, the Court faces a different issue. The late fees at issue in *Smiley* arose from that plaintiff's relationship with the bank as a *credit card holder,* an arrangement which

unambiguously is based on "an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended." 12 C.F.R. § 7.4001(a). A credit card holder fits neatly into the debtor role in a creditor/debtor relationship, which is essential to invoke § 85 of the Bank Act. In the instant case, Defendant's OD fees stem from a deposit agreement between a bank and one or more of its depositors. Although a creditor/debtor relationship exists, the roles are reversed: the bank is the debtor and the depositor is the creditor. *MJZ Corp. v. Gulfstream First Bank & Trust, N.A.,* 420 So.2d 396, 397 (Fla. 4th DCA 1982). Thus, the threshold question is whether the OD fees in this case are "connected with credit extension or availability," 12 C.F.R. § 7.4001(a), and accordingly, whether the usury laws apply at all.

Significantly, the *Smiley* Court approved the definition of "interest" found in 12 C.F.R. § 7.4001, which includes a reference to NSF charges. However, § 7.4001 clearly provides that NSF fees are interest if, and only if, the fee is a "payment compensating a creditor ... for an extension of credit." 12 C.F.R. § 7.4001(a). In the present case, the NSF and OD fees charged to Plaintiff were not compensating Defendant for an extension of credit. The fees were charged for the processing of bad checks. Thus, the holding and reasoning of the Supreme Court in *Smiley* is inapplicable.

This Court is without benefit of binding law to resolve this unique issue in Plaintiff's favor. Indeed, the federal cases which analyze the usurious nature of interest, and charges which can be incorporated into the calculation of interest, deal with loans and similarly structured transactions. These transactions unambiguously entail the extension of credit.[7] This, alone, raises suspicions about Plaintiff's novel argument. However, by analogy, case law exists which distinguishes loans from check transactions, and compels a determination that the payment of checks against an overdrawn account is not an extension of credit, and that the OD fee charged for such services is not interest.

### 1. *Loan Transactions Versus Checking Account Relationships*

■ Plaintiff would argue that the word "loan" is intentionally broad, and covers all circumstances in which there has been a *de facto* loan. Plaintiff urges that even Defendant considers the honoring of checks drawn against overdrawn accounts an "unsecured extension of credit." Such a broad interpretation of this term places form over substance, in contravention of the intent and purpose behind the usury laws.

■ Although a loan may exist regardless of the form of the transaction, "whether or not [a] transaction constitutes a loan, is to be determined from the surrounding facts in the particular case." *Calcasieu–Marine Nat'l Bank of Lake Charles v. American Employers' Ins. Co.,* 533 F.2d 290, 297 (5th Cir.1976) (quoting source omitted).[8] Courts should not interpret the transaction in a manner which would defeat the probable intentions of the parties. *See id.* at 296.

The classic definition of a loan is "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows." *In re Grand Union Co.,* 219 F. 353, 356 (2d Cir.1914). Moreover, "to constitute a loan, there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to pay absolutely, *together with such*

---

7. *See, e.g., Citizens' Nat'l Bank v. Donnell,* 195 U.S. 369, 373–74, 25 S.Ct. 49, 49–50, 49 L.Ed. 238 (1904) (charges for failure to pay a promissory note when due); *Cades v. H & R Block, Inc.,* 43 F.3d 869 (4th Cir.1994) (flat charges for tax refund anticipation loans); *Fisher v. First Nat'l Bank,* 548 F.2d 255, 258–59 (8th Cir.1977) (cash advance fees on credit cards); *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 F.2d 855 (6th Cir.1972) (closing costs charged on real estate loans); *Panos v. Smith,* 116 F.2d 445, 446 (6th Cir.1940) (charges for mortgage taxes and recording fees); *Cronkleton v. Hall,* 66 F.2d 384, 387–88 (8th Cir.1933) (bonuses and commissions paid to a lender).

8. The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*additional sums as may be agreed upon for its use." Id.* (emphasis added). Essentially, it is a contractual arrangement between two parties.

██ In contrast, a check "is a contract in writing by which the drawer contracts with the payee that the bank will pay to the payee therein the amount designated on presentation." *Sawgrass Builders, Inc. v. Realty Coop., Inc.,* 172 Ga.App. 324, 323 S.E.2d 243, 244 (Ga.Ct.App.1984) (quoting source omitted). Unlike a loan note, which is a promise by the maker to pay a specified sum and described as a two-party instrument—the parties being the maker and a payee—a check constitutes an order on a third party, a bank, to pay a specified sum and is a three-party instrument—the parties being a drawer, a drawee or payor bank, and a payee. The differences between these types of instruments and underlying transactions are apparent in the respective definitions promulgated in the Uniform Commercial Code. *Compare* UCC § 3–104(f) (1990) (definition of check) *with* UCC § 3–104(e) (1990) (definition of note).

The Supreme Court has noted the dichotomy between loan documentation and checks. *See Don E. Williams Co. v. Commissioner of Internal Revenue,* 429 U.S. 569, 97 S.Ct. 850, 51 L.Ed.2d 48 (1977). In that case, the Court declared that:

> The promissory note, even when payable on demand and fully secured, is still, as its name implies, only a promise to pay, and does not represent the paying out or reduction of assets. A check, on the other hand, is a direction to the bank for immediate payment, is a medium of exchange, and has come to be treated for federal tax purposes as a conditional payment of cash.

*Id.* at 582–83, 97 S.Ct. at 858.

When a bank honors a check, it reasonably expects the check to be paid in the normal course of business. *See Pioneer Valley Sav. Bank v. Indemnity Ins. Co.,* 225 F.Supp. 404, 411 (N.D.Iowa 1964), *aff'd,* 343 F.2d 634 (8th Cir.1965). Checks, as the most common items handled by banks, are handled in bulk as cash items on the assumption that they will be honored in most cases; provisional credits are entered immediately at all stages of the collection process, and become final without further action upon payment by the drawee bank. *See Calcasieu–Marine Nat'l Bank,* 533 F.2d at 300 (citation omitted).

The Court cannot agree with Plaintiffs argument that the deposit agreement relative to Plaintiff's checking account treats an overdraft as an application for advance credit. The implementation of OD and NSF fees was based on the banking industry's awareness that a depositor often writes checks under the mistaken belief that he has, or will have, sufficient funds to cover the check, without any intent to apply for credit. The imposition of the fee is solely contingent upon the depositor's failure to comply with the terms of the deposit agreement, which require the maintenance of sufficient funds to cover all checks presented.

### 2. *Contingent Default Fees Are Not Interest*

There is a significant body of law establishing that fees imposed as a result of a contingency are not considered interest in divining a violation of the usury laws. Prior to the passage of the Bank Act in 1864, the U.S. Supreme Court examined the dichotomy between "interest rates" and "contingent default charges," and determined that the latter are not interest for purposes of § 85. *See Lloyd v. Scott,* 29 U.S. at 226. In addressing whether late fees constituted interest, the Court held that:

> If a party agree[s] to pay a specific sum exceeding the lawful interest, provided he do[es] not pay the principal by a day certain, it is not usury. By a punctual payment of the principal, he may avoid the payment of the sum stated, which is considered a penalty.

*Id.* Accordingly, a fee, even when calculated according to a percentage of the amount owed, is not rendered usurious by a depositor's agreement to pay the fee contingent upon his delinquency, because the payment or non-payment of that fee is completely within the depositor's control.

One year prior to the enactment of the Bank Act, the Supreme Court once again spoke to the dissimilarities between interest

rates and contingent default charges, and stated that when "[t]he payment of anything additional depends also upon a contingency, and not upon any happenings of a certain event, [such is] insufficient to make a loan usurious." *Spain v. Hamilton's Administrator,* 68 U.S. (1 Wall.) 604, 626, 17 L.Ed. 619 (1863).

These cases stand for the proposition that only where the charge is required for a loan, and not where it is contingent on the happening of an uncertain event, will the charge be considered "interest." Because Congress is presumed to have adopted the federal common law meaning of "interest" in enacting § 85, *see Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975), the statute cannot be interpreted to include contingent default charges within the depositor's control, such as the OD fees imposed by Defendant in this case.

The logic behind this distinction is clear. If charges and fees within the depositors control, such as the OD fees in dispute, are deemed "interest," banks could not possibly know whether the ultimate rate on any given account would exceed the interest ceiling provided by law. The depositor could, therefore, render his account usurious, and hence unlawful, by simply maintaining insufficient funds in the account, thereby incurring an amount of fees equal to a usurious rate.

 In the absence of clear congressional intent to the contrary, the Court finds that the term "interest rates" or "rates of interest" as used in § 85 of the Bank Act ought to be construed in compliance with the term's plain and ordinary meaning, and its well entrenched federal common law meaning, so as not to include contingent default fees. *See Cipollone v. Liggett Group, Inc.,* 505 U.S.

504, 521–22, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992).

### 3. *Florida Is in Accord Regarding the Assessment of Contingent Default Fees*

 Florida courts adhere to Supreme Court precedent, and do not characterize fees received for participating in uncertain transactions as interest for purposes of usury determinations. *See, e.g., Kraft v. Mason,* 668 So.2d 679, 684 (Fla. 4th DCA 1996). Repeatedly, those courts have found that an agreement to pay fees is not usurious when payment depends upon a contingency. *See, e.g., Bailey v. Harrington,* 462 So.2d 861 (Fla. 3d DCA), *review denied,* 472 So.2d 1180 (Fla.1985).

Plaintiff admits that "[t]he charging of the 'Overdraft Item Fee' was *a condition* of the extension of credit when the Bank allowed a customer to overdraw their account." Plaintiff's Motion for Summary Judgment, at page 10 (emphasis added). It was within Plaintiff's control to avoid the OD fees. Reviewing the record before the Court, it is clear that no part of the deposit agreement contains a promise to pay anything absolutely in addition to the amount of the check presented against Plaintiff's account. The payment of anything additional depends entirely on a contingency, and not upon any happening of a certain event, which of itself is insufficient to make Defendant's OD fee usurious.[9] Accordingly, Plaintiff's contention that Defendant's OD fee is a subterfuge for charging a usurious rate of interest must fail.

### D. The Propriety of Summary Judgment

Having determined that state law controls not only the rate of lawful interest that a bank, national or state-chartered, may charge, but also the classification of charges

---

9. This holding is consistent with a Texas Supreme Court ruling cited by Defendant. *See First Bank v. Tony's Tortilla Factory, Inc.,* 877 S.W.2d 285 (Tex.1994). In determining whether NSF fees constituted interest, the Texas Supreme Court held that "[f]ees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws." *Id.* at 287. Al-

though the decision is not binding on this Court, since it is a decision by a state tribunal and involved a state chartered, as opposed to a national, bank, the fact that the OCC as well as other federal courts have cited *Tony's Tortilla* with approval, *see, e.g., Terrell v. Hancock Bank,* 7 F.Supp.2d 812, 817 (S.D.Miss.1998), it is persuasive in determining how Plaintiff's usury claim would be resolved by a Florida court.

subject to the usury laws, the Court must determine whether judgment as a matter of law is appropriate. Applying Florida's elements for establishing a cause of action for usury to the circumstances raised in this record, permits a legal resolution of the matter. Thus, resolving the issue by summary judgment is appropriate.

### 1. Elements of a Usury Claim

 Florida law sets forth four elements necessary to substantiate the usurious nature of a transaction. To establish usury, there must be: (1) a loan, either express or implied; (2) an understanding between the lender and the borrower that the money must be repaid; (3) a greater rate of interest than is allowed by law; and (4) corrupt intent on the part of the lender to take more than the legal rate of interest for the use of the money loaned. *See Dixon v. Sharp*, 276 So.2d 817, 819 (Fla.1973); *see also Lloyd*, 29 U.S. at 224 (establishing the elements of usury under federal common law). The party challenging the rate of interest and claiming usury has the burden of establishing these elements. *See Dixon*, 276 So.2d at 820; *Swanson v. Gulf West Int'l Corp.*, 429 So.2d 817, 819 (Fla. 2d DCA 1983); *see also In re Concrete Express, Inc.*, 87 B.R. 718, 721 (Bankr.S.D.Fla.1988). In this case, Plaintiff has the burden of proof on all elements of the prohibition to sustain a finding of usury under § 687.02 of the Florida Statutes.

 Having extensively discussed the dichotomy between interest and administrative fees, it is unnecessary to belabor this point. The Court has also addressed the differences between a loan and a non-loan transaction, such as a simple checking account, and has determined that honoring a check presented against an account with insufficient funds is not an extension of credit. This finding is buttressed by observing that Defendant charged the same fee whether it honored or rejected a check for payment from Plaintiff's checking account. By rejecting the check, it

cannot be said that credit was extended for the use of funds. Thus, there is no support for Plaintiff's argument that the character of the fixed OD fee is different from the NSF fee, and is, therefore, interest for the purpose of determining usury. Consequently, Plaintiff has failed to establish the first and third elements of an action for usury.

 Even assuming Plaintiff could provide a legal basis to support its contention that the honoring of the subject checks was actually an advance of money in the form of a loan, that the OD fees are a form of interest under Florida law, and that the aggregation of the interest calculated on the amount by which the overdraft exceeded the collected balance and the OD fee created a rate of interest in excess of the lawful rate, Plaintiff cannot prevail on its usury claim. Having failed to meet its burden of proving Defendant had a purposeful intent to violate the law, Plaintiff has not satisfied the fourth element necessary to sustain its cause of action.

### 2. Plaintiff Has Not Established Corrupt Intent on the Part of Defendant

Understanding the purpose behind the enactment of the usury laws is helpful in determining whether a transaction is usurious, providing a legal remedy to an injured debtor. In passing Florida's usury statute, the legislature sought to "bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 108 Fla. 450, 146 So. 551, 552 (Fla. 1933); *see also Cesary v. Second Nat'l Bank of North Miami*, 369 So.2d 917, 921 (Fla. 1979). In sum, Chapter 687 of the Florida Statutes was designed to protect borrowers from paying unfair and excessive interest to creditors who knowingly and willfully charge or receive interest in excess of 25% per annum. *See Jersey Palm–Gross, Inc. v. Paper*, 658 So.2d 531, 534 (Fla.1995).[10]

10. Although Plaintiff contends that Defendant's profit margin on OD fees exceeded the cost of processing overdrawn checks, resulting in deceptive and usurious practices, Plaintiff has "failed to show that [it was] deprived of a meaningful choice of banks with which [it] could do business

and that the terms of the agreements with [Defendant] were unreasonably favorable to the bank." *Jacobs v. Citibank, N.A.*, 61 N.Y.S.2d 869, 872, 474 N.Y.S.2d 464, 462 N.E.2d 1182 (N.Y. 1984) (upholding summary judgment for the defendant bank in a suit attacking NSF check

A crucial ingredient necessary to constitute the offense of usury is the intent with which the act is done. *See Lloyd,* 29 U.S. at 224. Although "ignorance of the law will not protect a party from the penalties of usury where it is committed ... where there was no intention to evade the law" and the facts show that an unlawful rate of interest was "the result of mistake or accident, no penalty attaches." *Id.*

■ Penalties for the commission of usury are only imposed on lenders who "willfully" violate the statute. *See* § 687.04, Fla. Stat. To be willful, the act must proceed from "a conscious motion of the will, intending the result which actually comes to pass." *Chandler,* 146 So. at 552. As distinguished from inadvertent conduct, usury is "restricted to such acts as are done with an unlawful intent." *Id.* A determination of usury is not predicated on "whether the lender actually gets more than the law permits, but whether there was a *purpose in his mind* to get more than legal interest for the use of his money, and whether, by the terms of the transaction and the means employed to effect the loan, he may by its enforcement be enabled to get more than the legal rate." *Id.* (emphasis added); *see also Dixon,* 276 So.2d at 820–21 ("usury is largely a matter of intent, and is ... determined by existence of corrupt purpose in the lender's mind to get more than legal interest for the money lent ... [and] from the circumstances surrounding the entire transaction.").

■ Generally, the question of intent is one of fact. However, in this instance, where there is no conflict of material facts, the question is one of law for the Court. *See, e.g., Atlantic Coast Line R.R. Co. v. Boone,* 85 So.2d 834, 842 (Fla.1956); *Richmond v. Florida Power & Light Co.,* 58 So.2d 687, 688 (Fla.1952); *United States Rubber Prods. v. Clark,* 145 Fla. 631, 200 So. 385, 389 (Fla. 1941); *Johnson v. Gulf Life Ins. Co.,* 429 So.2d 744, 746 (Fla. 3d DCA 1983); *see also Weingart v. Allen & O'Hara, Inc.,* 654 F.2d 1096, 1103 (5th Cir.1981) (citing *Atlantic Coast Line R.R. Co., supra* ). Again, Plaintiff had the burden of proving Defendant had a

"corrupt intent" to violate the usury statute at the time it honored the check and charged the OD fee, or alternatively, at the time it entered into the deposit agreement with Plaintiff.

Plaintiff has not produced even a scintilla of evidence that Plaintiff falls into that class of borrowers deemed necessitous or that Defendant took advantage of Plaintiff's condition in setting its OD fees. In this instance, it was Plaintiff who instigated the imposition of the OD fees. By maintaining sufficient funds in its account, Plaintiff could have avoided the payment of the OD fees. No one could have known at the inception of the banking relationship the total amount Plaintiff would be responsible for compensating Defendant for honoring checks presented against insufficient funds.

After carefully examining the record and the evidence proffered in support of Plaintiff's claim, the Court can find no demonstration of the necessary corrupt intent in Defendant's mind to get more than the legal rate of interest. Nor does the record reflect that this is a case of an overreaching lender taking advantage of a desperate borrower to impose undue or harsh terms. Thus, Plaintiff has failed to meet its burden of establishing a usury violation.

### 3. *The Effect of a Usury Savings Clause*

The absence of corrupt intent is further demonstrated by the express provisions in the deposit agreement. The schedule of fees, incorporated into the deposit agreement, contained a contractual disclaimer of any intent to violate usury laws. In defining the relationship between the parties and their respective obligations for "Overdraft Balances," the agreement explicitly stated that:

> The following accounts are charged the NationsBank Prime Rate plus 3% (*subject to the maximum rate permissible by law* ) for overdraft collected balances: *Simple Analysis Business Checking . . . .*

Defendant's Schedule of Fees (emphasis added).

charges). Thus, Plaintiff has not portrayed itself as a "necessitous borrower."

 A provision in a loan agreement which attempts to negate the effects of other provisions that might otherwise result in the extraction of an illegal rate of interest constitutes a "usury savings clause." *See Jersey Palm–Gross,* 658 So.2d at 534. Although the presence of a savings clause does not definitively insulate a lender against a usury violation, it can be considered as one factor in determining whether a lender possessed the intent to exact a usurious interest rate. *See id.* at 535.

In fact, some courts have acknowledged that "provisions in loan documents limiting the amount of interest payable to that authorized under applicable law have been recognized as valid and enforceable in this state and provide a complete defense to a charge of usury." *First American Bank & Trust v. International Medical Centers, Inc.,* 565 So.2d 1369, 1374 (Fla. 1st DCA 1990), *review denied,* 576 So.2d 286 (Fla.1991).[11] Florida's Supreme Court has held that "savings clauses serve a legitimate function in commercial loan transactions and should be enforced in appropriate circumstances." *Jersey Palm–Gross,* 658 So.2d at 535. In affirming the lower court's determination regarding the efficacy of a savings clause, the court stated that "where the transaction is not clearly usurious at the outset but only becomes usurious upon the happening of a future contingency, the clause may be determinative on the issue of intent." *Id.* (citing *Jersey Palm–Gross, Inc. v. Paper,* 639 So.2d 664, 671 (Fla. 4th DCA 1994)).

The scenario described by the Florida Supreme Court for considering whether a savings clause negates the intent element of a usury violation mirrors the circumstances in the instant case. The savings clause in the deposit agreement implied that *if* the amount of interest charged against an overdrawn account ultimately resulted in a violation of Florida's usury laws, then the transaction would be recalculated and restructured to eliminate any usury violation, and any excessive interest already paid would be returned to Plaintiff.

In sum, Defendant's representation that charges for checks presented against overdrawn accounts would not exceed "the maximum rate permissible by law," and the fact that the transaction was not usurious until an unanticipated contingency occurred, defeats any assertion by Plaintiff that Defendant possessed the intent to assess a usurious rate of interest. Absent proof of Defendant's corrupt intent, Plaintiff cannot avoid summary judgment on the issue.

## III. Conclusion

The primary objective of the Bank Act was to enact a federal usury law for national banks. This measure, codified at 12 U.S.C. §§ 85 and 86, prescribes an interest rate ceiling and federal remedy for usury. It also protects national banks from discriminatory state usury laws under the "most favored lender" doctrine articulated by the U.S. Supreme Court. *See Tiffany v. National Bank of Missouri,* 85 U.S. (18 Wall.) 409, 410, 21 L.Ed. 862 (1873). Discriminatory state usury laws are not at issue in this case.

Neither the Bank Act nor any other federal statute considers whether the provisions in contracts between banks and their customers may exact unreasonable or unconscionable fees. Plaintiff's preemption argument, consequently, is essentially an argument that even though the federal government has largely declined to regulate this area, Congress has nevertheless decided to preclude state regulation. The Court finds this argument is simply untenable.

 The explicit language of the Bank Act does not speak to charges for processing checks presented against overdrawn accounts. The legislative history reveals no evidence of congressional intent to displace state law regarding charges or payments other than for interest. Moreover, the Court is unable to find that Congress, when it used the phrase "interest at the rate" in enacting § 85 of the Bank Act, intended anything other than the ordinary and popular meaning

---

11. Without discussing the law concerning usury savings clauses, the bankruptcy court for the Southern District of Florida held that while a savings provision "by itself is insufficient to avoid an adjudication of usury, it is credible evidence of the parties' intention that usurious interest not be present in the agreement." *See In re Concrete Express, Inc.,* 87 B.R. at 719.

of the word "interest." Thus, in the Court's view, § 85 does not preempt all state laws dealing with charges and fees not commonly included in the term "interest."

Another reason Plaintiff's claim must fail is that agreements to pay charges only in the event of a contingency are not usurious. Policy concerns illustrate that limiting the ability of banks to charge OD fees on checking accounts is inefficient because those individuals who cause the expense associated with such behavior would then be required to pay for the consequences of their conduct. Instead, banks would be forced to increase service and processing compensation in another manner. Many depositors who would be paying these increased amounts maintain sufficient funds in their accounts and do not cause overdrafts. Forcing banks to recover costs created by depositors, such as Plaintiff, from all depositors provides, in short, an economic subsidy for those who do not comply with the terms of their deposit agreements. This inequitable result would be exacerbated by the fact that the number of overdrawn accounts would increase as the costs to these depositors decrease.

In sum, as a matter of law, the Court finds that the payment of OD fees as consideration for honoring checks presented against overdrawn accounts is not the payment of interest under the deposit agreement. The OD fees at issue are the antithesis of a loan, by putting an end to credit instead of giving it. The manner by which Defendant computed the amount of consideration for Plaintiff's right to overdraw its account does not affect its characterization as a usurious interest charge. Defendant was lawfully entitled to compensation for the services rendered for processing the checks and was a condition Plaintiff contractually agreed to pay.

Defendant has presented evidence in support of its contention that, in exchange for the imposition of the OD fee, it performed several processing functions other than those of a straight loan transaction. In the commercial context, the value of the services performed was clearly in excess of the amount necessary to remove any taint of usury. Plaintiff's business benefitted by Defendant's decision to honor the checks. In contrast, Plaintiff presented no evidence to show that the fee charged was unfair or unreasonable for the services Defendant performed and that the OD fee was not for services rendered as opposed to a hidden interest charge.

Moreover, the Court is unable to find a sufficient basis for Plaintiff's allegation that the OD fee was but a device to violate the statute condemning usury. Although neither party has pointed to any controlling case law specifically on point, the Court feels it is entirely proper to bear in mind not only the letter but the spirit of the usury law and its prime purpose to protect needy borrowers by penalizing unconscionable money lenders. *See Chandler,* 146 So. at 552.

Based on the foregoing, NationsBank's Motion for Final Summary Judgment is granted. Plaintiff, Video Trax, Inc.'s Motion for Summary Judgment is denied. As this Order disposes of all issues raised in this action, all pending motions are denied as moot.